[Civ. No. 20149. Third Dist. Apr. 30, 1982.]

EDISON SCHOOL DISTRICT et al., Plaintiffs and Appellants, v. JACQUE ROSS, as Associate Superintendent, etc., et al., Defendants and Respondents.

**COUNSEL**

Richard C. Anthony, Frank J. Fekete, Peter C. Carton, Ronald D. Wenkart and Joanne A. Velman for Plaintiffs and Appellants.

George Deukmejian, Attorney General, Richard D. Martland, Assistant Attorney General, and Jeffrey J. Fuller, Deputy Attorney General, for Defendants and Respondents.

**OPINION**

**PUGLIA, P. J.**—Plaintiffs Edison School District and its superintendent (hereafter District) appeal from a judgment denying declaratory and injunctive relief. The legal controversy revolves around a statute enacted as an emergency measure less than three weeks after the adoption on June 6, 1978, of article XIII A, of the California Constitution (Prop. 13). The statute (Stats. 1978, ch. 292 as amended, ch. 332) is popularly referred to as the "bail-out bill." It was intended to "provide for a more orderly implementation" of Proposition 13 (Stats. 1978, ch. 332, § 36); it appropriated several billion dollars in state funds for the use of local agencies including cities, counties, special districts and school districts. Section 1 of the statute pertains to state aid for education, and section 2 provides a formula by which apportionment of state aid to school districts was to be determined for the fiscal year 1978-1979.

Pivotal to this action is section 5 of the "bail-out bill" (Stats. 1978, ch. 332, § 3), which provides in pertinent part: "The aid provided in Section 2 of this act shall be reduced by one-third of the amount by which a school district's general fund and special reserve fund ending

balances exceed five percent of the district's general fund total revenue as adjusted at the end of the 1977-78 fiscal year, or fifty-thousand dollars ($50,000), whichever is greater.

"For purposes of this section, general fund and special reserves shall not include:

"(a) Noncash assets, such as stores, inventory, property and buildings, or other investments purchased prior to June 6, 1978.

"(b) Any amounts for self-insurance, contractual obligations, or *reserves established by law or a governing board policy adopted prior to June 6, 1978*." (Italics added.)

Under the reduction formula in section 5 of the "bail-out bill," funds not reserved prior to June 6, 1978, which exceeded 5 percent of the district's general fund total revenue as adjusted at the end of fiscal year 1977-1978 and which became part of a district's year-end balance on June 30, 1978, reduced the amount of state "bail-out" funds otherwise allocable to a district.

In the instant case the State Department of Education determined an item in the District's 1977-1978 budget, labeled "appropriation for contingencies," was not a reserve within section 5 of the "bail-out" bill and therefore the ending balance of that appropriation was includable in the reduction formula. District challenged the department's determination by initiating the instant action for declaratory and injunctive relief. At trial the District took the position that funds in the "appropriation for contingencies" account essentially constituted a "contingency reserve," immune from consideration in the reduction formula.

In its findings of fact and conclusions of law the trial court found the District's budget did not contain an item labeled a "contingency reserve," but did contain an "appropriation for contingencies" with an unexpended ending balance of $92,577, available for appropriation to other accounts in the succeeding fiscal year. The court concluded the account was an annual appropriation account, not a "reserve" within the meaning of the "bail-out bill."

The issue on appeal is whether substantial evidence supports the court's finding that the subject account was an "appropriation" rather than a reserve within the meaning of section 5 of the bailout bill." We conclude the finding is so supported. We therefore shall affirm the judgment.

Section 41010 of the Education Code provides in part: "The accounting system used to record the financial affairs of any school district shall be in accordance with the definitions, instructions, and procedures published in the California School Accounting Manual as approved by the State Board of Education and furnished by the Superintendent of Public Instruction. . . ."

The California School Accounting Manual, School Business Administration Publication No. 8 (1976 ed.) (Manual), prepared by the California State Department of Education designates the official forms which school districts are to use for fiscal reporting. The approved form upon which expenditure classifications are to be recorded contains numbered line item classifications, among which is line number 7900, designated "Appropriation for Contingencies." The nature of District's fiscal year 1977-1978 appropriation for contingencies, recorded in its budget documents at line number 7900 of the approved form, is at issue here.

The District contends an "appropriation for contingencies" is actually a reserve account, equivalent to a "contingency reserve" or an "undistributed reserve," and points to the acknowledged fact the budget item now designated "appropriation for contingencies" was formerly known as an "undistributed reserve."[1]

The District reasons that since what is now denominated an appropriation was formerly called a reserve, the two labels describe the same entity and therefore the "appropriation for contingencies" is conceptually identical to the "undistributed reserve."

The nature of an "appropriation" is described in the Manual. "An *appropriation* is an allocation of funds, income, or estimated income made by the governing board of the school district for specific purposes, usually limited as to the time when it may be expended. [¶] Appropriations made by the governing board authorize the school district to spend certain sums of money for definite activities. An appropriation specifies in some detail the exact purposes for which expenditures may

---

[1]Section 42125 of the Education Code provides: "The budget may also contain an amount to be known as the *undistributed reserve*. The funds in the undistributed reserve shall be available for appropriation by a two-thirds vote of the members of the governing board, to cover expenditures that have not been provided for or that may have been insufficiently provided for, or for unforeseen requirements as they may arise." (Italics added.)

There is no evidence that transfer from District's appropriation for contingencies required a two-thirds vote of the governing board.

be made, the amount to be spent, and the period of time during which the expenditures are to be made." (Italics in original; Manual, *op. cit. supra*, p. xii.)

The Manual then relates the appropriation for contingencies classification to the general concept of "appropriation" as described above. "Even though expenditures are carefully planned, changes in appropriations are sometimes necessary. Certain contingencies may arise that require additional appropriations. A contingent reserve (Appropriations for Contingencies) is provided from which the governing board may authorize transfers to activities for which insufficient funds were provided in the original appropriation." (Manual, *op. cit. supra*, p. xii.)

The Manual defines a "reserve" as "An amount set aside to provide for estimated future expenditures or losses, for working capital, or for other specified purposes." (P. VII-8.) The Manual also declares: "Reserves are portions of the balance remaining as unappropriated funds that are not available for appropriations, such as amounts in the Revolving Fund, Stores, and Prepaid Expense accounts. . . ." (P. VI-15.)

Defendant Jacque Ross is an associate superintendent of the State Department of Education in charge of the Division of Financial Services. The department is charged with administering the apportionment of state aid under section 2 of the "bailout bill." Superintendent Ross testified to the distinction between an "appropriation" and a "reserve." "An appropriation . . . is an expenditure classification . . . [¶] A reserve is an amount of money set aside for a specified purpose. And when it comes time to spend it for that specified purpose they can put it in that particular expenditure classification. [¶] They appropriate it from the reserves and put it into that expenditure classification."

Ross also testified that typically an appropriation is only effective for the budget year; that excess funds in the appropriation become unrestricted balances. On the other hand, at the end of the fiscal year, a reserve remains a reserve until the governing body transfers reserve funds into expenditure classifications. Ross described an appropriation as an account utilized in a current budget year and a reserve as representing funds set aside for the future or subsequent years. Ross summarized: if a district created a "reserve for contingencies" it would be a specific reserve for a specific contingency in a subsequent year and therefore different from an appropriation for contingencies.

Ross' testimony concerning the meaning of a "reserve" is consistent with the definition contained in the Manual since 1973. Accordingly, the District had ample notice that the "appropriation for contingencies" classification does not partake of the character of a "reserve" but is an "appropriation" for purposes of school district accounting in California.

Raymond J. Reischman, an accountant, testified as an expert on behalf of the District and stated that the terms "appropriation for contingencies," "contingency reserve" and "undistributed reserve" are essentially synonomous and should appear at line 7900 on the state-approved accounting forms. However, he admitted the word "reserve" is no longer applied to an expenditure account in a current budget year.

The District's superintendent, Orval W. Cauthon, testified that money in the "appropriation for contingencies" account was intended to be used for "standby repairs" on a water system, heating system and cafeteria cooling system, and also to retain the services of additional certificated employees. However, there is no evidence that the funds were expressly reserved for such use in a subsequent fiscal year. Superintendent Cauthon testified that for 12 to 15 years the District used the concept of a "contingency reserve" in its budget; however, he admitted that term "does not appear in writing in any of the budget documents . . . filed with the state" and that the District never adopted an item called a contingency reserve. He also asserted that a contingency reserve is a reserve even if not earmarked for a specific purpose.[2] However, that assertion is inconsistent with the Manual in effect since 1973, the testimony of Ross, and the District's own expert witness.

Ross explained that because an appropriation is effective only in a current budget year, it retains its character as an appropriation at the

---

[2]District cites *California Sch. Employees Assn.* v. *Pasadena Unified Sch. Dist.* (1977) 71 Cal.App.3d 318 [139 Cal.Rptr. 633], as establishing as a matter of law that funds in an "undistributed reserve" account are held as a reserve. However, that case did not specifically so hold. The court noted that a party had admitted in its pleadings that it had a specified amount designated as an undistributed reserve and also a specified amount in its general reserve. At issue was whether employees could properly be discharged for "lack of funds" when there exists a reserve account. No issue was tendered as to whether "undistributed reserves" were indeed reserves as discussed herein. The court concluded, "It would be manifestly contrary to legislative intent to hold that there cannot be a 'lack of funds' . . . so long as reserve accounts are in existence." (P. 321.)

Further, in this case, the crucial issue is whether under the facts an account designated as an "appropriation for contingencies" was actually an appropriation or a reserve account within the meaning of the "bail-out bill."

end of the fiscal year and therefore an item known as a contingency reserve would be different than an appropriation for contingencies which is basically an appropriation for intrabudget transfer. Funds remaining in the District's appropriation for contingencies account, like all other appropriations became part of the fund balance at the end of the fiscal year and were available for appropriation in the next fiscal year. Unlike funds in a reserve account, funds in an appropriation lapse and lose their identity at the end of the fiscal year.

As we have stated, the dispositive issue in this case is whether there is substantial evidence to support the trial court's finding that the item in the District's budget for fiscal year 1977-1978 called an appropriation for contingencies was indeed an appropriation and not a reserve within the meaning of section 5 of the "bail-out bill."

█ "Reserve" is not defined in the "bail-out bill." It is apparent, however, that the bill, enacted as an urgency measure in the immediate aftermath of the passage of Proposition 13, was designed to alleviate the harsh fiscal stringencies imposed upon school districts and local governmental entities by the newly enacted constitutional amendment. The "bail-out bill" addressed the immediate fiscal needs of school districts in the ensuing 1978-1979 fiscal year. It undertook fairly to apportion available state funds on the basis of the disparate needs of the respective districts in the 1978-1979 fiscal year. To that end the reduction formula of section 5 was devised to take account of carryover funds available to districts in fiscal year 1978-1979 in the form of unexpended, unallocated appropriations from the preceding year; funds restricted for specific purposes were not counted among those so available for fiscal year 1978-1979 if they were reserved by law or by board policy prior to the passage of Proposition 13. Thus funding for current operations would be state supplemented on the basis of relative need determined without disrupting long-term fiscal planning undertaken in good faith.

In light of the evident purposes of the "bail-out bill," we conclude the "reserve" excepted by section 5 thereof from the reduction formula consists of restricted year-end balances unavailable for appropriation to other budgetary accounts in a succeeding fiscal year. This interpretation is consistent with that of the Department of Education as set forth in the testimony of Superintendent Ross. █ The contemporaneous administrative construction of a statute by an administrative agency charged with its enforcement is entitled to great weight unless clearly

erroneous or unauthorized. (*Rivera* v. *City of Fresno* (1971) 6 Cal.3d 132, 140 [98 Cal.Rptr. 281, 490 P.2d 793].) The conclusions and judgment of the trial court also comport with our interpretation and analysis of the statute.

■ In examining the record to determine if the trial court's findings relative to the budget item in question are supported by substantial evidence, we are guided by the well established presumption that the record contains evidence to sustain every finding of fact. (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

■ "Our sole task is to determine 'whether the evidence, viewed in the light most favorable to [defendant], sustains [these] findings.' [Citations.] Moreover, 'In examining the sufficiency of the evidence to support a questioned finding an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion.' [Citations.] If appellate scrutiny reveals that substantial evidence supports the trial court's findings and conclusions, the judgment must be affirmed." (*Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691, 697 [139 Cal.Rptr. 700, 566 P.2d 602].) Thus, the testimony of the prevailing party alone may be sufficient. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].)

■ The record contains substantial evidence to support the court's finding the account at issue was an appropriation and there was in fact no item in the District's budget called a "contingency reserve." Although there was a conflict in opinion testimony concerning whether under proper accounting principles funds not designated for a specific purpose in a subsequent year may be held as a reserve, we necessarily resolve the conflict in favor of defendants' position that such funds may not be held as a reserve. The testimony of defendant Ross alone was sufficient to establish that the funds designated as an appropriation for contingencies were not restricted for a specific purpose in a subsequent fiscal year but were held as an expenditure account for the existing budget year—the balance of which lost its identity at the end of the fiscal year at issue.

It is the function rather than the label of an account by which its character as a reserve, or not, is determined. So considered, line item

7900, whether denominated an appropriation for contingencies or, as District would have it, a contingency reserve, or by any other name is an appropriation and not a reserve. As such the ending balance thereof was properly includable in the reduction formula of section 5 of the "bail-out bill."

The judgment is affirmed.

Blease, J., concurred.

**REGAN, J.**—I dissent.

Although Ross testified the term "undistributed reserve" was replaced because it was "an inappropriate term" he admitted that it "covered the same thing" and "the same function" as the "appropriation for contingencies." However, the term deemed inappropriate by the department was created by the Legislature and not for the department to discard. Section 42125 of the Education Code provides: "The budget may also contain an amount to be known as the *undistributed reserve.* The funds in the undistributed reserve shall be available for appropriation by a two-thirds vote of the members of the governing board, to cover expenditures that have not been provided for or that may have been insufficiently provided for, or for unforseen requirements as they may arise." (Italics added.) Yet, the accounting forms in the manual contain no item labeled "undistributed reserve."

If a district wished to set aside funds as an "undistributed reserve" as permitted by statute, there is no particular line item specifically designated for such. A district might logically utilize that line item which according to the manual was formerly termed "undistributed reserve." Indeed, in the instant case District Superintendent Cauthon testified the funds in the subject account were used as a "contingency reserve" and that the district considered such term as synonomous with "undistributed reserve." It was the superintendent's undisputed testimony that the district intended that funds in the "appropriation for contingencies" account at line 7900, be reserved, and that such had been the district's policy for 12 to 15 years.

Ross admitted that he would not object to the district using the label "contingency reserve" if what they meant was an "appropriation for contingencies." He also admitted that an "appropriation for contingencies" is conceptually identical to an "undistributed reserve."

The Department of Education may have unilaterally concluded the term "undistributed reserve" was an inappropriate term, but the budgetary term and the entity it describes were created by the Legislature (Ed. Code, § 42125) and beyond the Department's authority to change. Presumably, the Legislature, by its use of the word "reserve" intended the "undistributed reserve" to be a reserve account. The current label applies to that account which (1) formerly was called a reserve account, (2) and was in fact a reserve account, and therefore (3) remains a reserve account.

The underlying nature of the "undistributed reserve" account is unchanged by the department's use of the word "appropriation." Indeed, an attempt to change the nature of that which the Legislature has provided by statute would be an act in excess of delegated authority and void.

Accordingly, I would reverse the judgment.

A petition for a rehearing was denied May 24, 1982, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied June 30, 1982.